It is my view that the opinion of the Court of Appeal in this case is clearly correct. See 94 So.2d 708. I therefore dissent from the holding of the majority.

105 So.2d 228

**STATE of Louisiana ex rel. Steve PAUL et al.**

**v.**

**Horace M. PENISTON et al.**

No. 43956.

June 27, 1958.

Rehearing Denied Oct. 7, 1958.

Stafford & Pitts, Grove Stafford, Jr., Alexandria, Charles Riddle, Jr., Marksville, for appellant.

Gravel, Humphries, Sheffield & Mansour, Alexandria, for respondents-appellees.

HAMITER, Justice.

In this habeas corpus proceeding the relators, Mr. and Mrs. Steve Paul, seek the custody of their daughter, Shirley Rae Paul, who was eleven years of age when the suit was instituted on September 11, 1957 (she was born in July, 1946). The respondents are Mr. and Mrs. Horace Peniston, in whose care the child is now and has been for a number of years. Mrs. Peniston is a sister of Mr. Paul and, of course, is Shirley Rae's aunt.

The trial court (after a lengthy trial) recalled the writ of habeas corpus previously issued, rejected the demands of relators, and awarded permanent custody to Mr. and Mrs. Peniston. From the judgment relators are appealing.

Appellants contend on this appeal that they have a paramount right of custody, to which respondents give recognition, that can be forfeited only by improper conduct respecting the child; and they maintain that misconduct has not been established herein. Thus, in the brief of their counsel it is said: "A child remains under the authority of his father and mother until his majority or emancipation. * * * In a custody proceeding the sole question for the Court's consideration is whether the parents, by their conduct, have forfeited their paternal right to the child. * * * The Courts are not authorized to interfere with the parents' right to custody unless the opponent maintains the burden of proof showing the parents will neglect or expose the child to improper influences. * * *"

The legal principles governing the instant dispute are well stated in State ex rel. Deason v. McWilliams, 1955, 227

La. 957, 81 So.2d 8, 9, as follows: "As this is a habeas corpus proceeding, the custody of the child is the sole issue to be decided by this court. We have consistently held that, although parents have a paramount right to the custody of their minor child, this right is not an absolute one and must yield to the superior right of the State to deprive a parent of the custody of his child if the best interest and welfare of the child require it. * * * In State ex rel. Harris v. McCall, 184 La. 1036, 168 So. 291, 292, this court said:

" 'Although parents have a natural right to the custody of their children, nevertheless the state has an interest in children which goes beyond the mere paternal right. In all cases involving their custody, the welfare of the children must be considered, and should prevail over the mere parental right to their possession. * * *'

■ "As we pointed out in State ex rel. Guinn v. Watson [210 La. 265, 26 So.2d 740], supra, the courts of this state have invariably followed the rule that the welfare of the child is of paramount importance in determining who is entitled to its custody in a case of this kind. * * * Moreover, it was recognized in State ex rel. Martin v. Garza, 217 La. 532, 46 So.2d 760, that by his conduct a parent can forfeit his parental right to the custody of his child."

■ Unquestionably, both the Pauls and the Penistons enjoy excellent reputations in their respective circles of acquaintance, and each is fit and able to properly care for Shirley Rae. In fact, there is not even a suggestion on the part of relators or respondents that their opponents are unfit for having custody or that the home of either would not be conducive to her welfare. Consequently, there is presented for determination here only the question of whether, under the shown facts and circumstances, it would be to the best interest of Shirley Rae to permit her to remain in the care of the Penistons or to return her to the Pauls.

The record discloses that in August of 1948 Mr. and Mrs. Paul were living in Simmesport, Avoyelles Parish (they have since continued to reside there), with their three daughters, the two older girls then being thirteen and eight years of age and the youngest, Shirley Rae, two. At that time it was discovered that Mrs. Paul had contracted pulmonary tuberculosis, and she was advised that her condition would require hospitalization for an extended period. Because of this circumstance Mrs. Paul requested of Mrs. Peniston (her sister-in-law), who resided with Mr. Peniston in Alexandria (also their present residence) and had no children of her own, that she take and care for the youngest child. As to the exact arrangement between these two ladies there is a conflict. The mother declares that she intended only that the child was to be left with Mrs. Peniston until

she recovered and returned home; whereas, the aunt insists that she was to have the permanent custody of Shirley Rae. Both Mrs. Paul and Mrs. Peniston testified fairly on this point, and we think the conflict occurred as a result of a mutual misunderstanding. However, in view of the happenings since that time (as hereafter shown) ascertainment of the true arrangement agreed to is unimportant, for it is not at all determinative of the issue before us. We note that the trial judge was of the same opinion.

Mrs. Paul was released from the hospital in May of 1950, she having been discharged with a diagnosis of an arrested case of tuberculosis. Thereafter (on returning to her home in Simmesport), according to her testimony, she became gradually and increasingly active; and continuously since approximately a year following the hospital release she has led a normal life. Nevertheless, the Pauls allowed Shirley Rae to remain with the Penistons, who have reared her as their own child, and did not institute this custody proceeding (as before shown) until September, 1957. She addresses the Penistons as "Mamma" and "Pappy", although she knows who are her real parents; and throughout the mentioned period of some seven years the families occasionally visited each other, particularly on certain holidays. Too, in recent years Shirley Rae has spent from one to two weeks during each summer vacation with her real parents.

It is maintained by the Pauls that they did not voluntarily permit their child to be reared by the Penistons; that, rather, the latter would not let her come home. As a witness Mr. Paul stated that commencing in 1951 he regularly asked his sister to return Shirley Rae but that she kept "putting him off", saying that she wanted the child for company. The Penistons dispute this statement, they testifying that no such request was made until the summer of 1957, shortly before the filing of this suit.

With regard to such conflict in the testimony the trial judge said: " * * * I believe that even if such requests were made by the relators they were in such a casual way as not to be considered serious by the Penistons. The testimony of the relators themselves indicates the casual and insincere manner in which the requests were made, if at all. The actions of the relators speak even louder than their words, because from 1950, after Mrs. Paul returned from the hospital until the summer of 1957 the Pauls did not take any positive action to regain the custody of Shirley Rae, although they were physically and financially able to take care of her. They did not insist that the Penistons return Shirley Rae to Simmesport and, of course, the Courts were open to relators during all this time to enforce their rights as parents."

These observations are amply supported by the record. And we might add that if

the Pauls were desirous of having Shirley Rae live with them, as they would now have the court believe, they could have refused to return her to the Penistons at the conclusion of any one of her several summer vacation visits in Simmesport. Besides, it is to be noticed that after Mrs. Paul became physically able to care for Shirley Rae the real parents exerted little special effort to see her. Most of their contacts with the child occurred only when the Penistons brought her to Simmesport or when the Pauls were in Alexandria on business missions.

The Penistons, on the other hand, have alone supported the child. Of course, the parents have, from time to time, given her small amounts of spending money and some clothing; but these gifts were usually on birthdays or on holiday occasions. As was correctly stated by the trial judge, they amounted to "no more than a child might expect from any relative or close friend of the family."

The evidence conclusively shows, and the Pauls do not deny, that the Penistons are truly devoted to Shirley Rae and have given her every possible spiritual and material advantage, as well as their unselfish attention, love and affection. Thus, the child is an active church member, and each week they accompany her to several religious services. Again, Shirley Rae appears to be proficient in dancing, and she is a state champion baton twirler. In both of these fields of endeavor she has been encouraged and aided to the utmost by the Penistons. Also, in the parent organization of the school attended by the child Mrs. Peniston has worked untiringly as a member. Furthermore, Shirley Rae's school attendance record is excellent, it appearing particularly that she has never been tardy; her academic record is very good, especially in view of her many and varied extracurricular activities; and, concededly, she is a healthy, cheerful, well adjusted, popular and normal child. From all of which it can only be concluded that Shirley Rae could have no persons more devoted and attentive to her than are the Penistons.

While Shirley Rae knows who are her real mother and father (as previously indicated) and says that she is fond of them, we believe (particularly after reading her testimony) that such fondness is that which normally would be felt by a child for a close relative; that in her mind her true devotion as a daughter is to the Penistons; and that the latter's home is considered by her as her home—the only one she has ever known. In this connection the child testified that she would much prefer to stay with the Penistons. (It is noted that the fondness which Shirley Rae feels for the Pauls has been encouraged throughout her life by the Penistons, they having wanted her to know her real parents and to respect and love them.)

Of course, under our jurisprudence the wishes and desires of children do not generally govern in matters of custody. However, at the time of the trial Shirley Rae was eleven years of age and in the sixth grade in school. And her testimony, to say nothing of that of numerous witnesses who know her well, bespeaks her intelligence, alertness, and stability, as well as her awareness of the situation in which she finds herself. Under these circumstances her preference, although not controlling as aforesaid, should be given some consideration.

The facts of the instant case are strikingly similar to those of State ex rel. Graham v. Garrard, 213 La. 318, 34 So.2d 792, 793, wherein the mother of an eight year old boy sought his custody as against the paternal grandparents with whom the child had lived since his infancy. In permitting the child to remain in the custody of the grandparents we said: " * * The trial judge, who saw the child and heard the testimony of all witnesses, pointed out in his reasons for judgment that the child was well cared for, loved, properly treated, well mannered, happy, contented, and well dressed. From our reading of the record we are convinced that these grandparents loved this child as if he were their own.

"During the many years while these respondents have had the care and custody of the child, relatrix has contributed very little for his care and maintenance. However, she did on special occasions, such as Christmas and birthdays, send him gifts. * * * She stated that in recent years she did not contribute anything to the child's care and maintenance because she was of the opinion that he was being well treated and properly provided for and was not in want."

The court in the Graham case, after pointing out that all the while the mother had been on good terms with the grandparents and had free access to the child, then concluded: "The child is well, happy, and contented with his grandparents, who have given him the love and affection of a real father and mother, and we believe that this happiness and welfare—the paramount considerations in this case—would be best served by leaving him in their care.

"This court has said that reasonable latitude must be left to the trial judge in matters affecting the welfare of children, and that his judgment based upon the facts disclosed in any case is entitled to great weight. * * *"

Here, as in the Graham case, the trial judge set forth in writing his findings of fact, with all of which we are in accord. And in view of such findings we are compelled to agree that the interest and welfare of Shirley Rae would be best served by permitting her to remain with respondents, Mr. and Mrs. Peniston.

For the reasons assigned the judgment appealed from is affirmed.

TATE, J. ad hoc, concurs with written reasons.

FOURNET, C. J., absent.

TATE, Justice ad hoc (concurring).

I respectfully concur, based upon my present acceptance of the factual appreciation of the majority opinion that the parents of Shirley Rae Paul forfeited or abandoned their natural rights as her parents to their child's custody.

In my opinion, however, the sole question is not (as suggested by argument of counsel) whether it would be to Shirley Rae's better interest to remain with her aunt and uncle rather than her parents.

The right of a parent to his child existed before governments or other social institutions of mankind. This natural right proceeds from our Creator and exists independently of the state; the state (and particularly by a democratic government where rights not delegated thereto by the people are reserved to the people, U. S. Constitution, Amendment X, Art. 1, Section 15, La.Constitution of 1921, LSA) does not in my humble opinion possess the power to take away in favor of a stranger the God-given right of a parent to his child, in the absence of the parent's for-feiture or abandonment of such right or of positive detriment to the child. Cf., State ex rel. Martin v. Garza, 217 La. 532, 46 So.2d 760; State ex rel. Martin v. Talbot, 161 La. 192, 108 So. 411.

Thus, in advance of a finding that the parents have abandoned their right to their daughter, I regard as of no legal consequence the testimony of the psychiatrist that the child would be happier with her aunt than with her mother, or the testimony that Shirley Rae's baton-twirling activities would be disrupted by her return to the rural and more humble home of her parents (in which, perhaps, the less glamorous duties of learning kitchen chores awaited her), or even the rather heart-breaking testimony of the child's own preference for her aunt and uncle and of her great unhappiness when she learned that her parents wished her to remain in their (and her) home.

Although there is some doubt as to whether the parents ever actually intended to really abandon their child to the aunt and uncle with whom she was left when the family was in desperate straits, for the present I can concur with the decree herein upon the understanding that the trial court and the majority found, as compared with a passive separation forced by circumstances and prolonged through the gratitude of the parents to the then childless couple for their help in the parents' hour

of need, an active neglect of their parental duties with regard to the child which could be considered a forfeiture or abandonment of their right to their little girl.