TATE, Judge
(dissenting).
The writer respectfully dissents from the refusal to grant a rehearing herein.
The majority has affirmed the trial court’s restoration to the mother of the custody of a three-year old child, although the mother had voluntarily surrendered the child soon after birth to the defendants and, so far as the record shows, had never visited with the child since. Just seven weeks earlier the same trial court had denied the mother’s writ for return of the child on the ground that the mother was morally unfit as living in open concubinage with a man married to another.
The majority of this court has somewhat hesitatingly affirmed the trial court’s reluctant restoration of the child to the natural mother on the ground that the majority does not wish to disturb the trial court’s discretion in the matter. This is a sound principle of appellate review; but it does not apply when the trial court’s ruling was based, not on what it truly felt to be the best welfare of the child, but instead on what it felt to be a legal principle absolutely requiring the return of the child to the natural mother under the circumstances.
Early statements of the law to such seeming effect, however, have been qualified by more recent holdings of the Supreme Court. Under these, the best welfare of a child is deemed to be served by leaving it with a foster family to which *895 the natural parent has voluntarily surrendered it with the intention of transferring custody permanently, and in which the child has been raised as a member since an early age — even though the natural parent subsequently desires the return of the child and can afford it a good home at such later time. State ex rel. Paul v. Peniston, 235 La. 579, 105 So.2d 228; State ex rel. Deason v. McWilliams, 227 La. 957, 81 So.2d 8.[1]
So far as the record shows, the attention of the trial court was not called to these later clarifications by the Supreme Court of the law relating to custody of children in circumstances such as the present. I feel that if the principle applied in the cited Supreme Court decisions had been followed by the trial court, it would not have felt obliged to return the child to the natural mother, whose home on the face of the record seems to be a poor risk indeed for the child’s future security and happiness.
First, perhaps, we should mention the virtually ideal home from which this little girl will be torn by the decree of the Louisiana courts. The defendants are a stable couple, owning and managing an established business, with three other children— all boys, aged 9, 6, and 3 (the latter two of them also adoptive).
The present three-year old baby has lived with this family since two months after birth, and the record shows that her foster parents love her and the other children as one very close family. The child knows no other home, no other parents, no other brothers, no other grandparents, uncles, and aunts — she has grown up as a contented member of this well-adjusted large family virtually since birth, although no attempt is made to hide from the adoptive children in it that they were not naturally born to the defendant couple.
We should also, before referring more fully to the applicable legal principles, examine briefly the home offered this child by the plaintiff’s natural mother.
The trial court had initially denied the mother custody of the child on September 24, 1962, because she had been living in open concubinage with David Mouton until about five days before the hearing. Thereupon, on October 9, 1962 (about two weeks later), she married Mouton and soon thereafter instituted the present proceedings which some few weeks later resulted in a custody decree in her favor.
The child was born on the last day of 1959. The mother had just been divorced from Percy Benoit two months earlier, on allegations (which she admitted) that she had been separated from him since March 10, 1958 (about seventeen months before the divorce) and had lived in open adultery in August and October of 1958 (about fourteen months before the present child was born) in Midland with an unnamed man whom the record reveals was not David Mouton, the gentleman the plaintiff married just before instituting the present custody proceedings.
It is admitted, however, that Mouton is the natural father of the present child, which was born out of wedlock on December 31, 1959. Mouton, however, did not try to marry the present plaintiff until later in 1962, just before the present suit was filed, although the couple had lived in open *896 concubinage for approximately a year commencing in 1961. One reason Mouton did not do so earlier apparently is that — between the first liaison in 1959 and the present liaison commencing in 1961 — Mouton had himself married yet another girl (his second marriage, following the death of his first wife), from whom he separated after two months, and from whom he did not obtain a divorce until the day before he married the present plaintiff, his third wife. (He had filed for a divorce from this second wife at about the same time in September, 1962, that the present plaintiff filed her first unsuccessful custody proceedings.)
Mouton is 55 years of age, while the present plaintiff, his third wife, is 30 years old.
In assessing the plaintiff’s ability to be a good mother, we should not neglect mentioning how she accepted the responsibilities of parenthood as to her other child, a four-year-old boy. This boy was born of her former marriage to Benoit, some six months after she and Benoit had separated. For three of its four years since birth, this child has lived with the plaintiff’s sister and the latter’s husband, although twice (once in a fit of temper) the plaintiff has taken this child back from the couple, the first time for six months and the second time a week or so before the custody proceedings were filed to obtain the present child. (In fairness, we should add that the reason she alleges for not having been able to have maintained custody of her first child is that she worked as “a waitress on tables in dance halls”, Tr. 59, Volume II, which reason has now disappeared since she has married Mouton and now at last intends to provide a home for both her children.)
And why, again, did the trial court feel obliged to uproot this child from the happy family and the happy home in which she has lived virtually since birth, in order to return her to the natural mother in an environment so unpromising on the face of it for future stability and future happiness?
As earlier noted, the trial court felt obliged to return the child upon the statement of the applicable law contained in State ex rel. Guinn v. Watson, 210 La. 265, 26 So.2d 740, 741, 742, that “The rule in this state seems to be clear that the mother has a superior right to the custody of her child over third persons, but that this right must yield to the superior right of the State to deprive her of the care and possession of her child in the event the physical, mental, and moral welfare of the child requires it.” The trial court interpreted this to mean that the natural parents have the “paramount right to the custody of his or her child, as against third persons, and they are entitled to such custody unless it is established that the circumstances are such that the physical, mental and moral welfare of the child require that it remain with the third parties” — that is, that the natural parent is absolutely entitled to the return of the child unless it is clearly shown that positive detriment to the child will result if it is returned to a presently unfit home now maintained by the natural parent.' The natural mother’s past immorality and instability is then disregarded, since she has (for seven weeks) lived respectably as a married wife of a new husband.
More or less explicit in the trial court’s reasons were the concepts that, since the child could never be adopted without its natural mother’s consent, the child should now be withdrawn from the home of its foster parents, who will not be able to adopt it so long as the natural mother maintains her opposition; and that since, even if the mother had not yet convincingly rehabilitated herself in these few short weeks, nevertheless the mother (if she really does continue to maintain herself in her reformed state) could sooner or later require the return of the child, so therefore it is better to tear the child from her foster home now when she is only three years old rather than a year or several years later.
In the opinion of the presently dissenting members of this court, in view of the Supreme Court’s holdings in Paul v. Penis *897 ton and Deason v. McWilliams, these reasons disappear for tearing the little three-year old girl out of the foster home in which she has lived since birth. The mere fact that (at present) it seems that the foster parents will not be able to formally adopt their foster child which they have raised, furnishes no compelling reason to uproot a child from its well-adjusted foster environment in order to return it to a natural parent who had voluntarily placed the child in the foster home with the intention of surrendering the child permanently to the foster parents. State ex rel. Deason v. McWilliams, cited above. Likewise, future efforts of the natural parent to recover the child from the foster parents will be unavailing, so long as the moral and physical welfare of the little girl is still served by her remaining in her foster home. State ex rel. Deason v. McWilliams, cited above.
.The cited Supreme Court decisions concern instances where it was held that the paramount rights of natural parents, unquestionably of good moral character and unquestionably able to provide a good home for their natural child, must nevertheless yield to the social concept that the best welfare of the child is served by not uprooting it from a good foster home in which the natural parents had placed it with the intention of voluntarily surrendering it permanently to be raised therein as a child of the foster parents.
The love and care of the foster parents, the secure and happy environment afforded by them to their child, are deemed to have provided a permanent home for the child through the initial consent of the natural parents, from which the child should not be uprooted simply because the natural parents have now changed their mind and now desire the return of the child. In such instances, all things being equal, the foster parents by their love, sweat, and tears are deemed to have succeeded to the place of the natural parents. To take the child from the only parents it has known and loved, to take the child from a stable and happy environment, in order to give it to a person who is now a complete stranger to the child (because of the voluntary abandonment by this person of the child), is deemed not to be in the interest of the child, if the displacement is sought only by reason of the formal blood relationship of the natural parent (when this parent has until then ignored the natural obligations resulting from blood parenthood and had also voluntarily surrendered the child to the foster home with the intention that it stay there permanently and be raised as a child of the foster parents).
This development of the jurisprudence relating to custody has had a comparable development in the legislative development of the law relating to adoption.
An interlocutory decree of adoption is normally rendered following a hearing held not more than sixty days following the petition for adoption, LSA-R.S. 9:428, 429; a petition for final adoption may not be filed until at least six months after the interlocutory decree and not until the child has lived with the adoptive parents for at least a year, LSA-R.S. 9:432. Prior to 1960 amendments, the natural parents had the absolute right to withdraw their consent and to prevent the adoption any time before the final decree of adoption (which, as previously stated, could not normally be entered until the child was with the adoptive parents for longer than a year). Green v. Paul, 212 La. 337, 31 So.2d 819, and succeeding jurisprudence.
However, in 1960 the statute was specifically amended to provide that the withdrawal of the consent of the natural parents to the adoption was no longer a bar to the final adoption if such withdrawal took place after the interlocutory decree (which as previously noted could be entered two months or less after the adoptive child entered the adoptive parents home). LSA-R.S. 9:429, 432, as amended by Acts 250 and 268 of 1960.
This to my notion represents a considered legislative adoption of the social concept that the rights of the natural parents must yield to the child’s welfare in remaining in *898 a secure environment in the foster home to which the child has been voluntarily surrendered by the natural parents with the then-intention that the infant remain there permanently to be raised as a child of the foster parents. Under this concept, the welfare of the child under these circumstances, overrides the ordinarily paramount right of the natural parents to secure the return of their natural child to the good home which they themselves are now willing to afford the child.
Before closing, we should briefly advert to the adoption proceedings filed by the defendant foster parents herein, which were introduced into evidence in the present case. These show that the natural parents executed a notarial act of surrender of the child for the purpose of adoption by the petitioners; that on April 19, 1960, the petitioners applied for an interlocutory decree of adoption, which was granted on June 6, 1960, without opposition by the natural parents; that it was not until March 3, 1961, that the natural, mother filed any indication whatsoever of a desire to withdraw her consent to the child’s adoption by the defendants herein, by which time the little girl was over fourteen months old and had been in the defendants’ home for about a year; that only by reason of this withdrawal of consent, did the trial court refuse to enter a final decree of adoption, on the ground that the 1960 amendments (which thereafter will prevent the natural parents to bar an adoption by withdrawing their consent after the interlocutory decree of adoption) applied prospectively only from July 27, 1960, the date of their effect. In re Adoption of Gordon, La.App. 4 Cir., 135 So.2d 673.
Had the adoption proceedings been filed just three and one-half months later, the foster parent’s irrevocable and final adoption of the child could not have been prevented by the natural mother’s belated desire for the return of the child. But the fact that the child cannot be formally adopted under the strict terms of the adoption statute, does not entitle the natural parent to the return of the child from the custody of the foster parents to whom the child was surrendered by the natural parent and by whom the child has been raised since shortly after birth. State ex rel. Deason v. McWilliams, cited above.
The three-month hiatus in the application of the adoption statute — which now in essence provides that the withdrawal of the surrender of the child by the natural parents is no longer a relevant factor in determining what is for the best welfare of the child, LSA-R.S. 9:429, 431, 432, as amended in 1960 — does not bar the courts in this custody proceeding from determining now that the permanent custody of the foster parents should not be altered simply because of the subjective circumstance that the natural parent now attempts to withdraw her surrender of the custody of the child to the foster parents, which was intended to be permanent — at least, when the child is and has been happily transplanted into its foster family for a substantial period of its life as a result of the surrender and abandonment of the child to the foster parents, and when this abandonment by the natural parent, further, was voluntary and unconditional on her part at the time.
One final word — the natural mother manifested no desire for the return of her child until long after the interlocutory decree of adoption and until the child was over fourteen months of age. Even then, by her immoral way of life, she manifested no desire to provide a decent home for the child, and in fact the trial court on the initial custody proceedings formally declared that she was not entitled to the return of the child— nearly three years of age at the time — because the mother was living in open concubinage.
This delay on her part in asserting an interest in the child, this immoral way of living on her part, were the cause she was not in a position to demand the return of her child until it is past three years of age. Under these circumstances, I think that the natural mother actively abandoned the child and has forfeited any parental right she may have had to its custody, at least as *899 against the foster parents to whom she surrendered the child to be raised as their own over three years ago and who are the only parents the child knows.
It is heartbreaking that a mother to whom God initially gave a baby cannot have its return as of right, but it will be equally heartbreaking to take this child from the secure and only home it has known and from the foster parents who have raised it from infancy, and it will be heartbreaking to destroy the happiness of these foster parents who love the child as if it had been born to them. The child is their child far more than it is the natural mother’s, who abandoned and forfeited her God-given primary right to the child, of her own choice and of her own free will.
For the reasons perhaps too forcefully (and, certainly too lengthily) stated, I must respectfully dissent from the refusal of my esteemed brethren of the majority to grant a rehearing and to reconsider the result reached by them in the original majority opinion only after conscientious study and deep concern.
SAVOY, J., dissents for the reasons assigned herein.

. As noted by the present writer’s concurring opinion in Paul v. Peniston, cited above, be did not agree at the time with any theory that the nearly-absolute paramount rights of the natural parents could be defeated by the foster parents, in the absence of positive detriment to the child or a prior active abandonment by the natural parents of their parental obligations. See 105 So.2d 232. This was close to the position of the dissenters in State v. McWilliams, and it was not the position of the majority in Paul v. Peniston. However, the majority holdings in both of these decisions by our state Supreme Court, not the dissents or concurrences, furnish the legal principles which we as an inferior state court must apply whether or not we as inferior judges personally agree with the Supreme Court’s holdings.