230 So.2d 644 (1970)
Joseph CREPPEL
v.
Janet Lee THORNTON, also known as Janet Lee Creppel.
No. 3764.
Court of Appeal of Louisiana, Fourth Circuit.
January 12, 1970.
*645 Wilmer Glauner Hinrichs, New Orleans, for plaintiff-appellant.
Lawrence L. Lagarde, Jr., New Orleans, for defendant-appellee.
*646 Before REGAN, REDMANN and BARNETTE, JJ.
BARNETTE, Judge.
This is a proceeding initiated by a petition for habeas corpus brought by a natural father seeking the custody of his acknowledged child. After a hearing on return of the writ the trial court vacated and annulled the writ of habeas corpus, rejected relator's demand and dismissed his petition. The plaintiff (or relator) appealed devolutively.
Joseph Creppel, who styles himself plaintiff in this proceeding, lived in an open and notorious common-law relationship with Janet Lee Thornton, also known as Janet Lee Creppel, in the town of Lafitte in Jefferson Parish for some months before and after the birth of the child in question. They held themselves out to the community as man and wife.
On July 27, 1967, a child was born to Janet Lee Thornton at West Jefferson Hospital. Its birth was registered by the mother, who signed the certificate as "Janet Creppel." The name of the father is given as Joseph Norris Creppel. The child was named Gregory Joseph Creppel. The mother and child returned to Lafitte where they lived with the father Joseph Creppel until September, 1967, when the mother left their common domicile and took the child with her to New Orleans. This proceeding was brought a year later. The substance of the father's complaint is that the mother is morally unfit; that she has subjected the child to an environment injurious to his welfare; and that its best interests would be served by custody being granted to him. Alternatively, the father prayed that the child be placed in some other responsible home or institution and his right of visitation be recognized and enforced.
The testimony and evidence in the record before us on this appeal clearly establishes:
1. The child was publicly acknowledged by both the father and mother through many acts in the community in which they shared a common home. There was never any attempt to deny or conceal their parentage of the child.
2. Additionally the father executed a notarial act of acknowledgement.
3. The mother judicially admitted their natural relationship to the child.
4. There is no evidence that there existed at the time of conception and birth any impediment to marriage.
Upon conclusion of testimony at the hearing on the writ of habeas corpus, which indicated habits and behavior and a way of life on the part of both the mother and father of questionable fitness for the rearing of the child, the court summarily concluded the hearing by saying: "All right. The writ of habeas corpus will be recalled. Case dismissed."
The judgment formally rendered and signed on the same date, October 4, 1968, recites:
"When, after hearing the pleadings, the evidence and argument of counsel, the Court considering the law and the evidence to be in favor of the respondent, for the reasons orally assigned * * *."
There are no reasons for judgment in the transcript of appeal. There is a reference in appellant's brief to reasons for judgment allegedly given by the trial judge in chambers which we will not consider since they are not a part of the record. We do not know, therefore, whether the judgment was based on a conclusion that the petitioner had no legal right to custody or that he failed to make out a case on facts. We will address ourselves first to the questions of law.
Chapter 5 of the Civil Code of Louisiana "Of Paternal Authority" defines in section 2 (articles 238-245) the reciprocal duties *647 of parents and illegitimate children toward each other and, among other things, provides that the legally acknowledged illegitimate child shall have a right to sue his parent for alimony. LSA-C.C. art. 242. Also pertinent to the issue presented here are:
LSA-C.C. art. 256:
"The mother is of right the tutrix of her natural child not acknowledged by the father, or acknowledged by him alone without her concurrence.
"After the death of the mother, the father is of right the tutor of his natural child acknowledged by him alone.
"The natural child, acknowledged by both, has for tutor, first the father, in default of him, the mother."
and LSA-C.C.P. art. 4261:
"The tutor shall have custody of and shall care for the person of the minor. He shall see that the minor is properly reared and educated in accordance with his station in life.
"The expenses for the support and education of the minor should not exceed the revenue from the minor's property. However, if the revenue is insufficient to support the minor properly or to procure him an education, with the approval of the court as provided in Article 4271, the tutor may expend the minor's capital for these purposes."
The obligation imposed by this latter article relative to the rearing and education of the minor contemplates the use of funds or revenue from property belonging to the minor's estate and administered for him by his tutor. It does not impose upon the tutor the obligation to rear and educate him at the tutor's personal expense. The obligation to personally provide for the needs of the child stems not from the tutor-ward relationship, but from the parent-child relationship. This obligation is set forth in LSA-C.C. arts. 238-245.
All of the foregoing articles read together define the obligations of the father-tutor toward his acknowledged illegitimate child-ward. As father he is legally obligated, as a very minimum, to provide alimony for the child's subsistence. Morally, of course, his obligation extends much beyond the legal minimum. As tutor it is his duty to represent the child in the enforcement of the child's right to this support and in general to do everything necessary to the end that the child's best interests are served. This general duty embraces the obligation of protection of the child's moral, physical, and emotional welfare.
The foregoing articles do not give the father a preferential right to the child's custody as against the mother, but impose certain duties upon him with the corresponding right to seek judicial enforcement on behalf of the child of his rights, among which is the right to a proper custody.
The father-tutor in this case is attempting to discharge his dual role and obligation toward his acknowledged illegitimate child. We hold that he has the legal right in the discharge of this duty to seek judicial determination of the child's custody to the end that his best interests may be served.
The paramount consideration in determining where and with whom the child shall live shall be the best interest of the child. The rights of fathers and mothers as between themselves and as to others must yield to this paramount consideration. Dungan v. Dungan, 239 La. 733, 119 So.2d 843 (1960); State ex rel. Paul v. Peniston, 235 La. 579, 105 So.2d 228 (1958); State ex rel. Guinn v. Watson, 210 La. 265, 26 So.2d 740 (1946); State ex rel. Copell v. Marusak, 205 So.2d 477 (La.App.3d Cir. 1967). The ultimate decision must be made by the court on the best evidence available to it, and its decision may be changed from time to time as changing circumstances *648 indicate in the best interest of the child. The father's right in this case to seek and obtain on behalf of the child a judicial determination of his best interest must be recognized and enforced.
If the parents of the child had been married the father's action to assert his right and duty of custodial care would properly have been ancillary to a suit for separation or divorce. Since that remedy is not available he must find another procedure through which to obtain recognition and enforcement of his legal right. A resort to the writ of habeas corpus is a proper procedure to obtain the relief sought. State ex rel. Steen v. Wade, 207 La. 177, 20 So.2d 747 (1944); State ex rel. Jagneaux v. Jagneaux, 206 La. 107, 18 So.2d 913 (1944); Hickman v. Hickman, 218 So.2d 48 (La.App.3d Cir. 1969); LSA-C. C.P. art. 3821.
It should be mentioned that the father sought the assistance of the Juvenile Court for the Parish of Orleans on a complaint that the child (being in Orleans Parish) came within the purview of the juvenile court law, and particularly LSA-R.S. 13:1570, in that his environment and associations were injurious to his welfare and that the mother was an unfit person to be entrusted with his care. The juvenile court declined to accept jurisdiction and took no official action. It was then that the present action was brought in the district court. We hold that the action was proper.
Now addressing ourselves to the facts as disclosed by the record before us we are confronted with a more difficult decision. As indicated above, neither parent has much to offer the child. The probability is great that neither parent will, for any substantial length of time, care for the child personally in his or her home and that it will likely be subjected to continual removal from one place to another. In fact when the case was heard below, the child had lived with the mother only at short intervals and was kept by various friends of hers under arrangements which we consider very insecure. On the other hand, the father's employment as fisherman and tugboat employee and his way of life is such that he could not offer the child his personal care but proposed to provide a home for him with a married couple in the town of Lafitte.
The mother, Janet Thornton, said she had been married to a man named Kuntz from whom she was divorced and by whom a child was born (a girl, age not stated) who was living with paternal grandparents in Texas. She then lived in common-law union with a man named Jeffrey by whom she had two illegitimate children (boys) who at the time of the trial below were approximately of school age or younger. She took those children with her to live with Joseph Creppel in Lafitte. Creppel cared for them in the manner of a step-father until they were removed with the Creppel child to live with their mother in New Orleans. Joseph Creppel also had a previous illegitimate child allegedly living somewhere in Texas. Shortly before trial below, Janet Thornton allegedly married a man named Lafitte, but she continued her alleged employment as a waitress in bars and restaurants in the French Market section of the City of New Orleans. The children were kept off and on by her in her living quarters in that section of the City and at times were cared for by friends. At the time of trial the Creppel child allegedly was being cared for by a person identified only as "Lupe," name not otherwise known, living at an uncertain address on Elysian Fields.
We should not indulge in speculation as to what changes have taken place in the 14 months since the hearing below. Certainly there is nothing in the record to justify a speculation that either the father or mother will live any differently in the future. If substantial changes should take place the issue of custody may be called up again for review in the light of such change of circumstances.
*649 Experience has shown that children born and brought up in situations such as that revealed here are far more likely to become juvenile delinquents and emotionally insecure persons than those who have a more stable and morally suitable environment. We think it would not serve this child's best interests to delay longer his placement in the custody and control of his natural father and tutor who is charged by law with the responsibility to provide for his support and to properly rear and educate him in accordance with his station in life. If he should fail in the discharge of that responsibility there are adequate provisions in the law to enforce the obligation and give the child needed protection.
We are not unmindful of the father's poor record of responsibility concerning his other natural child and the implications concerning his morals, but the probability is that the foster parents with whom he will provide a home for the child in Lafitte have more security to offer the child than the mother has demonstrated her ability to give. The rearing of a child in Lafitte according to the father's standard of living and in keeping with the customs of the community are, in our opinion, more to be desired than anything the mother can offer. The child's best interest must be and is our paramount consideration in reaching our decision.
We stated above that the record does not indicate if the trial court dismissed the proceeding for legal or factual reasons and we therefore do not know what the trial court's findings of fact were. At any rate it is our opinion that the best interest of the child, Gregory Joseph Creppel, will more likely be served under the custodial control of his father, Joseph Creppel.
For these reasons the judgment appealed is reversed, and it is now ordered, adjudged and decreed that the writ of habeas corpus issued herein be now made absolute and the respondent, Janet Lee Thornton, also known as Janet Lee Creppel or Lafitte, be ordered and commanded forthwith and immediately to deliver the child, Gregory Joseph Creppel, to the custody of Joseph Creppel.
The respondent, appellee, is cast for all costs.
Reversed and rendered.
REDMANN, Judge (dissenting).
From the trial judge's observation during trial that his primary consideration was the welfare of the child, I am satisfied that he accepted the entitlement of the father of an acknowledged child to seek custody, but did not find the mother an unfit person.
Even the father testified the mother did not mistreat her children; his objection was to the environment of the French Quarter of New Orleans.
I believe the trial judge was correct in refusing to award the custody to the father. Whether by oversight or because of a belief that habeas corpus is inappropriate, the judgment did not fix visitation rights for the father, which I believe it might appropriately have done. I would amend it to do so and affirm as amended.