412 So.2d 223 (1982)
Flaudry Ann LaPOINTE, Plaintiff-Appellee,
v.
Larry James MENARD, et al., Defendants-Appellants.
No. 8742.
Court of Appeal of Louisiana, Third Circuit.
March 10, 1982.
Rehearing Denied April 29, 1982.
*224 Edwin Patout of Haik, Broussard & Haik, New Iberia, for defendants-appellants.
Gordie R. White, New Iberia, for plaintiff-appellee.
Before CULPEPPER, GUIDRY and STOKER, JJ.
GUIDRY, Judge.
In this habeas corpus proceeding plaintiff seeks to regain the custody of her eight year old son, Ravis John Ryder. The defendants are the child's maternal aunt, Melissa LaPointe, and her husband, Larry James Menard.
A brief summary of the facts, which for the most part are not in serious dispute, is necessary for a proper understanding of the issues presented by this litigation.
On July 13, 1972, Flaudry Ann LaPointe, then approximately eighteen years of age, gave birth to an illegitimate child, Ravis John Ryder. Sometime in the latter part of the year 1973 or in the early part of the year 1974, Flaudry voluntarily gave physical custody of the child to the Menards and either simultaneously or shortly thereafter executed an act of surrender in their favor. The Menards then proceeded to file adoption proceedings; however, these proceedings were dismissed when Flaudry revoked her act of surrender and the consent which she had given to the adoption of Ravis. Following dismissal of the adoption proceedings and on March 30, 1976, plaintiff sought by habeas corpus to regain the custody of Ravis. The Menards answered alleging that plaintiff had abandoned her child and was unfit for custody. The matter was tried in April of 1976 but for some unexplained reason a formal judgment was not rendered and signed until July 11, 1977. The judgment of July, 1977 found plaintiff unfit and awarded temporary custody of the child to the Menards, subject to reasonable visitation rights in favor of Flaudry. In denying the relief sought by Flaudry the trial judge stated in written reasons as follows:
"... The plaintiff is employed as a bar maid and her work history indicates that she has worked in various bars and lounges, except for employment as a waitress at a fried chicken place, and two jobs as secretary. She indicates that she had not finished high school. The plaintiff was very candid about her relationship with her various boyfriends, some of whom lived with her and others took trips with her.

Her mother and father testified as to her conduct and advised of her having men in her house and in her trailer.
The plaintiff gave no indication that she intended to change her life style. In view of the evidence the court cannot allow her to have custody of her child until such time as there would be a change in her life style."
On December 9, 1977, plaintiff again sought by habeas corpus to regain custody of her child. This second motion was not tried until June 1978. Following this *225 second hearing the court, for written reasons assigned, again refused to grant custody to plaintiff. In its written reasons, the court recognized that plaintiff had changed her lifestyle for the better but not to the extent required for a change of custody.
Either before or shortly following her second try for custody of her child, Flaudry began to date Wiley Doucet, who was then married but separated from his wife. Flaudry and Wiley Doucet began living together and sometime during the year 1979, Flaudry gave birth to an illegitimate child, later named Scottie Doucet. Wiley Doucet subsequently divorced his wife, married Flaudry and formally adopted the child. Following this change in circumstances, Flaudry instituted the instant habeas corpus proceeding seeking, for a third time, to regain custody of her child.
The evidence adduced at this third hearing established that there has been a complete change in plaintiff's lifestyle. In the year 1980 she married Wiley Doucet who is characterized by the evidence as mature, stable and responsible. Mr. Doucet has been steadily employed by the same company for over twenty-eight years and earns in excess of $50,000.00 annually. Plaintiff and her husband live in a comfortable, three bedroom, brick home located in a nice residential section of New Iberia. The record reflects that plaintiff's marriage is happy and stable and that she is content with her role as a wife and mother. According to the several witnesses who testified, including a social worker with the office of Human Development, plaintiff now displays all of the characteristics of a good wife and mother and is now able to provide Ravis with a good home.[1]
In contrast with the above the record reflects that Ravis has lived with defendants since infancy, a period of over seven years, and has always been considered as a member of the family. The Menard family has had financial difficulty over the years, in spite of the receipt by Mr. Menard of a $187,000.00 damage settlement, such that Mr. Menard declared bankruptcy some two years ago. Presumably, the latter circumstance is responsible for the fact that the Menard family moved their residence on five different occasions during the year and a half preceding trial of this rule. In spite of some hardship, the record reflects that, the Menard family weathered their difficulties. Apparently, such difficulties as may have plagued the family had no effect on Ravis as he is described by both lay and expert witnesses as a happy, well adjusted youngster. Mr. Menard testified at trial that he was gainfully employed, earning $1400.00 monthly, and that he and his wife were able to provide Ravis with a good home.
Defendants testified that plaintiff, even after her marriage to Mr. Doucet, failed to exercise her rights of visitation under the previous judgments with any constancy, visiting with her son, Ravis, only when it suited her convenience. Plaintiff denied the above and testified that her efforts to visit with Ravis were frustrated by defendants' deliberate refusal to accord her her visitation rights. There is evidence in the record which corroborates the accusations of both. Plaintiff's lifestyle prior to her marriage to Mr. Doucet tends to corroborate her infrequent visitation of Ravis. On the other hand in corroboration of plaintiff's allegations, the record reflects that the relationship between plaintiff and defendants quickly deteriorated following the voluntary grant of physical custody of Ravis to defendants, being thereafter characterized by constant recriminations of wrongdoing. On at least one occasion defendants were found guilty of contempt for failure to accord plaintiff her right of visitation.
At the hearing, defendants presented the testimony of Dr. Wyatt, a psychiatrist, and *226 Dr. Cromwell, a psychologist. Both experts opined that a change in Ravis's custody, after a period of eight years, might cause emotional damage to the child and recommended against a change of custody. Both experts testified that their opinion was not based upon anything discovered during their examination of Ravis. Rather, each based their opinion on studies which show that a parent-child bonding takes place during the first five years of life, such that if the relationship is terminated it often causes emotional problems. The experts were questioned as to the period of adjustment required if the child were moved. Dr. Wyatt opined that it would take six months to a year. Dr. Cromwell indicated he had no way of knowing in that it would vary from child to child depending on the severity of the "separation anxieties".
The trial judge spoke with Ravis in chambers, out of the presence of the litigants and attorneys. In this conversation Ravis indicated a desire to remain with the Menards; however, the court opined that Mrs. Menard did "what she could to influence the child to reach this decision".
At the conclusion of the hearing in this matter the trial judge determined that plaintiff's lifestyle had, in fact, changed to the extent that she could provide her child with a good home. The trial judge then reasoned as follows:
"The Court feels compelled under the present jurisprudence to award custody to the mother, Flaudry LaPointe Doucet.
The Court will delay this change of custody until the termination of the school year for obvious reasons.
The Court will order that the mother, Mrs. Doucet, have the child from Saturday at 12:00 noon until Sunday at 6:00 p. m. the first weekend after the judgment is signed and every week-end thereafter from 6:00 p. m. Friday until Sunday at 6:00 p. m. It is further provided that the child shall be allowed to attend all school and athletic activities as he is presently doing.
The Court, in view of the unusual circumstances in this case, will allow the Menards to have visitation with the child every other week-end from Friday at 6:00 p. m. until Sunday at 6:00 p. m. after the school year ends."
Judgment was rendered accordingly. Defendants have appealed and plaintiff has answered their appeal.
Defendants appeal and plaintiff's answer to the appeal pose two issues for determination: (1) did the trial court err in decreeing a change in custody; and, (2) if not, did the trial court err in awarding visitation rights to the defendants.

THE CHANGE OF CUSTODY ISSUE
It is well settled in our jurisprudence that a parent has a paramount right to custody of his or her child and may be deprived of such right only for compelling reasons. In accordance with this principle, it is well recognized that when a parent competes with non-parents of the child, the parent's right to custody must be recognized unless it be established by convincing proof that he or she is unfit or has forfeited the parental right of custody by action or omission. Wood v. Beard, 290 So.2d 675 (La.1974); State in the Interest of Taylor, 296 So.2d 841 (La.App. 2nd Cir. 1974), writ refused 299 So.2d 799 (La.1974); Girouard v. Halpin, 368 So.2d 1139 (La.App. 3rd Cir. 1979); Tolar v. Cunningham, 368 So.2d 1188 (La.App. 3rd Cir. 1979), writ refused 369 So.2d 710 (La.1979); Paul v. Cloud, 378 So.2d 586 (La.App. 3rd Cir. 1979), writ refused 380 So.2d 101 (La.1980); Juneau v. Bordelon, 380 So.2d 208 (La.App. 3rd Cir. 1980); LaCroix v. Cook, 383 So.2d 59 (La. App. 2nd Cir. 1980), writ denied 384 So.2d 801 (La.1980).
Appellants concede on appeal correctness of the trial court's conclusions that plaintiff's lifestyle has changed and that she can now provide her son Ravis with a good home. Appellants likewise concede that the legal principles above referred to are applicable to the instant controversy. However, appellants urge that the facts of this matter, considered in light of these established principles, do not compel the *227 conclusion reached by the trial court. As we understand the thrust of defendants' argument they contend that plaintiff has forfeited her parental right to custody by reason of her past conduct which resulted in two prior decisions which found her to be an unfit parent. From this premise they argue that the trial court should have simply considered the matter from the standpoint of "best interest of the child" as between the competing parties.
We do not agree that a parent forfeits forever the parental right to custody of his or her child by reason of the fact that at one time or another he or she has been declared morally or otherwise unfit for custody. Even as between competing parents, the cases are legion which have awarded custody to a parent once denied that right because of his or her prior lifestyle. Even more so should this same result obtain in custody contests between parents and non-parents. As stated by Justice Tate in his concurring opinion in State ex rel. Paul v. Peniston, 235 La. 579, 105 So.2d 228 (1958):
"The right of a parent to his child existed before governments or other social institutions of mankind. This natural right proceeds from our Creator and exists independently of the state; the state (and particularly by a democratic government where rights not delegated thereto by the people are reserved to the people, U. S. Constitution, Amendment X, Art. 1, Section 15, La. Constitution of 1921, LSA) does not in my humble opinion possess the power to take away in favor of a stranger the God-given right of a parent to his child, in the absence of the parent's forfeiture or abandonment of such right or of positive detriment to the child. Cf., State ex rel. v. Garza, 217 La. 532, 46 So.2d 760; State ex rel. Martin v. Talbot, 161 La. 192, 108 So. 411."

Although admittedly plaintiff's conduct and lifestyle following the birth of her child and for some seven years thereafter were socially unacceptable, irresponsible, and in total disregard of her duty as a parent, there is no showing of any intent on the part of plaintiff to abandon her child to the defendants. To the contrary plaintiff maintained a continuing interest in and contact with her child and was persistent in her efforts to regain his custody. Cf., State ex rel. Paul v. Peniston, supra; Paul v. Cloud, supra.
The circumstances of this case are not unlike those present in State in the Interest of Taylor, supra; Wilson v. Wilson, 307 So.2d 674 (La.App. 2nd Cir. 1975); Snell v. Snell, 361 So.2d 936 (La.App. 2nd Cir. 1978), writ refused 363 So.2d 536 (La.1978); Tolar v. Cunningham, supra; LaCroix v. Cook, supra; and, Juneau v. Bordelon, supra. In all of the cited cases the parental right to custody was recognized.
In sum we find that the facts and circumstances presented fall within the purview of the established legal principles initially set forth. Accordingly, we conclude that the trial court did not commit clear error in recognizing plaintiff's paramount right to the custody of her minor child.
Appellants additionally argue that the trial court erred in ordering a change of custody in the face of the expert medical testimony which stands unrefuted. Although the welfare of the child takes precedence over enforcement of the parent's paramount right to custody, in the application of this rule it is inappropriate to compare the mother's home with that of the non-parents, when the former environment is acceptable. In the instant case the trial court gave consideration to the testimony of the experts but presumably concluded that this evidence did not show that a transfer of custody to the mother would be inimical to the welfare of the child. We cannot say that the trial judge clearly erred in this determination. As we previously stated, the opinions of these experts (that a transfer of custody would probably cause the child some emotional damage) were not based upon their examination of the child but rather on studies involving the parent-child relationship. Additionally, both experts seemed to be in agreement that the child could adjust and would do so within a relatively short period of time.
*228 Although the opinions of experts in matters of this kind are persuasive and must be given consideration, as we stated in Broussard v. Broussard, 320 So.2d 236 (La.App. 3rd Cir. 1975):
"... courts cannot abdicate their decision-making responsibilities in favor of the medical profession but must consider all factors present in the case."

For the foregoing reasons we will affirm the trial court judgment insofar as that judgment awards custody of the minor child, Ravis John Ryder, to the plaintiff.

THE GRANT OF VISITATION PRIVILEGES TO DEFENDANTS
Plaintiff has answered the appeal and asserts that the trial court erred, as a matter of law, in granting visitation privileges to defendant. We agree that this was error.
We know of no law and have been cited to none which authorizes the grant of visitation privileges to collateral relatives. It was not until the passage of Act 436 of 1970[2] that Grandparents were granted visitation rights and then only under clearly prescribed circumstances.
In 67A C.J.S. Parent and Child Sec. 41(c), at page 296, is stated:

"Generally, where custody of a child has been awarded to a fit parent, ... third persons are not entitled to visitation privileges...."
In 59 Am.Jur.2d Parent and Child Sec. 45, at page 130 it is stated:
"Parents who have custody have the right to determine with whom the child will associate. Accordingly, where a parent or parents have custody, the courts will not undertake to give visitation rights to a nonparent... over the parents' objection."
While we recognize that an attachment has built up over the years between Ravis John and the defendants and we fully appreciate the hardship which will be brought to bear upon both the child and defendants by a denial of the latters' visitation rights, we conclude that we have no choice but to reverse that portion of the judgment of which plaintiff complains.
For the above and foregoing reasons we reverse that part of the judgment which awards visitation privileges to Mr. and Mrs. Larry James Menard. In all other respects the judgment appealed from is affirmed at defendants' cost.
AFFIRMED IN PART and REVERSED IN PART.
STOKER, J., concurs and assigns reasons.
STOKER, Judge, concurring.
In Tolar v. Cunningham, 368 So.2d 1188 (La.App. 3rd Cir. 1979), writ denied, 369 So.2d 710 (La.1979), an opinion authored by this writer, we held that the rule of Wood v. Beard, 290 So.2d 675 (La.1974) rested upon a rebuttable presumption. The rule of Wood held that when parents compete with non-parents for the custody of a child, "the parent's right to custody is superior, unless the parent is unable or unfit, having forfeited parental rights". In Tolar we said "the Supreme Court recognizes a rebuttable presumption that the child's best interests are better served by awarding custody to the parent." We also said, based on Wood, that "this presumption in favor of the parent can be overcome only if the non-parent shows that the parent is unable to provide a home for the child, is unfit for custody or has abandoned the child." Unfortunately, the Supreme Court has limited the bases for rebuttal to these three situations.
In this case the child, Ravis John Ryder, was born July 13, 1972, and has been with Mr. and Mrs. Menard since late 1973 or early 1974. Therefore, Ravis is almost ten years old and has lived with the Menards since he was about a year and a half old. It would seem to me that these circumstances alone might be regarded as rebutting any presumption that the best interests of Ravis *229 will be served by transferring custody to his mother at this late date. The testimony of the experts indicates that the welfare of Ravis would most likely be served best by leaving him where he is. As noted above, however, no considerations other than those enumerated in Wood may be opposed to the paramount rights of the parents.
In view of the fact that we must reverse the judgment of the trial court giving the Menard's visitation rights, and the evidence indicates that intense antipathy exists between plaintiff and the Menards, there is a high probability that Ravis will not ever be permitted to visit with the Menards. Apparently, we are powerless to avoid this harsh result.
NOTES
[1] The social worker who testified did the home study in connection with the adoption of plaintiff's second child by Wiley Doucet. This social worker had previous contact with plaintiff as a result of her previous attempts to regain custody of Ravis. This witness testified that she was favorably impressed with the change in plaintiff's lifestyle, so much so that she was able to return a favorable adoption report.
[2] The visitation rights accorded Grandparents were further broadened by acts passed in 1972, 1975 and 1978.