MOORE, J.
_JjThe father, Ryan Hawkinberry, appeals a case review judgment that found his 11-year-old son, C.N., still in need of care and continued him in the custody of the Office of Community Services (“OCS”). *872 Finding no abuse of discretion or violation of Children’s Code provisions, we affirm.

Factual and Procedural Background

In early 2005, C.N. and his two brothers were living with their mother, Angela, and her husband, James, in the Green Acres area of Bossier City.[1] According to OCS reports, Angela and James were heavy drug users who sold everything in the house to support their habit; they eventually abandoned the children. OCS reports also listed C.N.’s father as unknown; Ryan had never had any paternal relationship with his son.
Somebody took the boys to an RV in Cypress Black Bayou Park, where they lived a while with another crack addict, Marsha, who finally threw them out on May 23. They then walked to a clinic in Plain Dealing for help. The staff called OCS, which found the boys had not been eating regularly, bathing or going to school.
The state obtained an instanter order placing the three boys in OCS custody. In late May the Bossier City Court, exercising juvenile jurisdiction, continued their custody with OCS and ordered officials to locate Ryan, C.N.’s putative father. Counsel was appointed for Ryan. At an adjudication hearing on August 19, counsel offered DNA test results proving Ryan’s paternity of C.N., but conceded he (counsel) had been unable to reach Ryan. Citing the neglect of the parents, the court found all jgthree boys in need of care. These hearings were not transcribed.
The boys received temporary placement in Louisiana, but in late August 2005 they were sent to foster care with a Mrs. Snyder in New Paris, Ohio. Apparently both Ryan and Angela were from Ohio, and other relatives live near New Paris. By all accounts C.N. and his half brother A.B. have done well there. Ryan lived in Mansfield, Ohio,, about three hours’ drive from Mrs. Snyder’s house, and was able to exercise monthly visitation for the first time.
According to OCS reports, the visits were intermittent. The first time, Ryan drove to New Paris and asked C.N.’s grandfather for $50 gas money each way; the grandfather complied, but refused to cosign a loan so Ryan could buy a car. On the return trip, Ryan asked if he, his wife and four children could stay the night with the Snyders, as they usually were ejected from motels due to the kids’ unruly behavior.[2] The Snyders agreed, but found the kids had rummaged through their drawers and closets, apparently without objection from Ryan. C.N. stated that on another visit, he found a smoldering marijuana joint on the back porch shortly after Ryan and his wife had been sitting there; he was afraid of returning to a drug-using home. At some point, Ryan moved from Mansfield to a farm in Eaton, Ohio, to be with his ailing father; this is only about 30 minutes’ drive from Mrs. Snyder’s house. No home study has yet been conducted on the farmhouse, but C.N. told investigators that he felt out of place when he visited the large family there and was unhappy that Ryan wanted to schedule visits that ^conflicted with football practice.
Case review hearings in November 2005 and April 2006 found C.N. still in need of care. These proceedings were not transcribed, but the court minutes show that Ryan was present for the April 2006 hearing. The original case plan addressed resolutions for C.N., his mother Angela, his *873 two brothers and their respective fathers, but not Ryan, as his whereabouts were not known at that time.
In May 2006, Ryan filed a motion to modify the disposition, obtain custody of C.N. and end OCS’s involvement in the case. At a case review hearing on May 26, the court denied this motion. The hearing was not transcribed, but the minutes show that Ryan and his counsel were present, and that the court adopted the case plan with modifications.

Case Review and Action of City Court

The instant case review hearing took place in August 2006. Ryan did not attend but appeared through counsel. The state introduced three reports from Volunteers for Youth Justice setting out the facts summarized above. These found that C.N. was thriving at Mrs. Snyder’s house, benefited from being with his brother A.B. and close to his grandfather and cousins, and expressed a strong opinion to stay there. They also advised that it would be detrimental to move him to the “unknown environment” that his father would offer, citing certain legal problems.[3] The recommendations were: (1) allowing C.N. to testify at the case review hearing; (2) giving Ryan a copy |4of the earlier case plan; (3) taking a home study of Ryan’s father’s farmhouse in Eaton; and (4) requiring Ryan and his wife to take parenting classes. The state asked the court to maintain the status quo, and counsel for C.N.’s mother agreed.
Ryan’s counsel called one witness, Andrew Wilson, an OCS agent who supervised C.N.’s foster care. He admitted he had spoken to Ryan only once, about three weeks prior to the hearing, but that Ryan had seen a family counselor in Ohio and was not responsible for any of the missed visits with C.N.
Angela’s counsel called Mrs. Snyder, who chronicled the problems of coordinating C.N.’s visits with Ryan. Finally, the court interviewed C.N. in chambers.
The court ruled from the bench that there was good cause for the initial intervention by OCS, there was continuing necessity for placement of C.N., he had not yet established a meaningful relationship with his father, and his current placement with Mrs. Snyder was appropriate. However, the court stated it did “not approve of the [OCS case] plan in its present version and orders modifications.” These included parenting classes for Ryan and his wife, counseling for C.N., Ryan and his wife, random and regular drug screens for Ryan and his wife, monthly visits not to interfere with C.N.’s education or extracurricular activities, and a home study of Ryan’s current residence. The court added that based on its interview, it found C.N. old enough and articulate enough to express his feelings and interests.
[¡¡The oral ruling was reduced to judgment which Ryan has appealed.

Discussion: Award of Custody

By his first assignment of error, Ryan urges the court committed manifest error in denying him custody of C.N. He contends that the parent has the paramount right of custody which should be denied only when he is shown to be unfit, incapable of caring for the child, or otherwise detrimental to the child. State ex rel. Paul v. Peniston, 235 La. 579, 105 So.2d 228 (1958); State in Int. of DEM, 441 So.2d 514 (La.App. 2 Cir.1983). Referring to earlier case review hearings which were *874 not transcribed, he contends that Ohio authorities conducted a home- study of his home and found it sufficient for a placement of C.N. He also contends that the actions of C.N.’s “caretaker” thwarted the visitation order, not any actions on his own part. He concludes the evidence is neither sufficient nor compelling enough to deny his request for custody.
All other parties respond that the court was not plainly wrong to maintain C.N. in OCS custody. Angela specifically contends that numerous cases cited in Ryan’s brief are inapplicable: State in Int. of DEM, swpra, deals with the burden of proof at an adjudication hearing, not a case review hearing, and State ex rel. Paul v. Peniston, supra, was a custody dispute between private individuals, not proceedings brought by the state. Counsel for C.N. urges that the court applied the proper standard under La. Ch. C. art. 681 A, “the child’s health and safety shall be the paramount concern.” Moreover, Ryan “was a stranger to C.N. before these proceedings began,” thus supporting the decir sion to deny him custody at this time.
| fiThe court correctly noted that C.N. was adjudicated a child in need of care in August 2005. The dispositional alternatives in such a case are provided by La. Ch. C. art. 681 A:
In a case in which a child has been adjudicated to be in need of care, the child’s health and safety shall be the paramount concern, and the court may:
(1) Place the child in the custody of a parent or such other suitable person on such terms and conditions as deemed in the best interest of the child including but not limited to the issuance of a protective order pursuant to Article 618.
(2) Place the child in the custody of a private or public institution or agency.
(3) Commit a child found to be mentally ill to a public or private mental institution or institution for the mentally ill.
(4) Grant guardianship of the child to any individual.
(5) Make such other disposition or combination of the above dispositions as the court deems to be in the best interest of the child.
The trial court’s award of custody at a disposition hearing is entitled to great deference and will not be reversed on review except in the clearest case of abuse of that great discretion. State in Int. of JW, 2000-1445 (La.App. 4 Cir. 1/10/01), 779 So.2d 961.
The record shows that Ryan had no contact with C.N. until the fall of 2005, when DNA testing proved he was the father of the 11-year-old child. The city court was not plainly wrong to find that the parties needed time to adjust to their new relationship, as they “really don’t know each other.” As noted, the visitations in Ohio have been intermittent and impeded by issues of scheduling and transportation. A home study of Ryan’s previous home in Mansfield noted somewhat cramped quarters and a lack of privacy for the|7children; no home study has yet been conducted on the farmhouse in Eaton. The city court expressed the need “to be satisfied what that environment [the farmhouse in Eaton] is all about.” By contrast, officials found C.N. was thriving in foster care with Mrs. Snyder, enjoying the greatest stability he had ever known in his young life. Finally, the court assigned appropriate weight to C.N.’s testimony in chambers, noting its reluctance to let an 11-year-old dictate the outcome. Based on this evidence, we cannot say the city court abused its great discretion in finding that C.N.’s best interest would be served by not giving his custody to Ryan at this time.
*875 The jurisprudence cited by Ryan in brief does not alter this analysis. Both State ex rel. Paul v. Peniston, supra, and Tennessee v. Campbell, 28,823 (La.App. 2 Cir. 10/30/96), 682 So.2d 1274, affirm the parent’s paramount right of custody as against a nonparent. However, as shown by Angela, those cases are custody disputes between private parties, not proceedings filed by the state to declare the child in need of care. In the latter situation, the best interest standard of Art. 681 applies. The cases of State in Int. of DEM, supra, and State in Int. of Black, 310 So.2d 174 (La.App. 4 Cir.1975), are also inapposite as they address the burden of proof at proceedings analogous to the adjudication hearing. After a child has been adjudicated in need of care, Art. 681 applies.
This assignment of error lacks merit.

Other Issues

By his second assignment, Ryan urges the court committed manifest error by revising the case plan sua sponte and ordering OCS to make | particular revisions to it. He contends that under La. Ch. C. art. 700 A, the court must either approve or reject the case plan, but cannot revise it or order any particular placement of children. In support he cites State ex rel. LCB, 2001-2441 (La.1/15/02), 805 So.2d 159. Specifically, he argues that the addition of parenting courses, random drug screening and family counseling were not part of the case plan and not warranted by the evidence.
The court’s authority to render orders is defined in La. Ch. C. art. 700 A, which provides in pertinent part:
At the conclusion of the case review hearing, the court may:
(1) Approve the plan as consistent with the health and safety of the child and order compliance by all parties. * * *
(2) Find that the case plan is not appropriate, in whole or in part, based on the evidence presented at the contradictory hearing and order the department to revise the case plan accordingly.
While some passages of the oral ruling and judgment might suggest that the court itself ordered changes in the case plan, the overall thrust of the judgment is to direct OCS to make certain revisions. Such action is not only authorized by Art. 700 A(2) but also within the court’s discretion, in that Ryan was not a party to the original case plan. On the record presented, the revisions were not an abuse of the city court’s discretion.
Finally, we recognize that under State in Int. of LCB, supra, and State in Int. of RA, 2006-2380 (La.12/15/06), 944 So.2d 1262, “the court cannot revise the plan itself or order specific placements of children placed in the Department’s custody.” In the instant case, the city court certainly did not order any specific placement of C.N. contrary to OCS’s plan, and for the | ¡¡reasons expressed it properly directed modifications to that plan. This assignment lacks merit.
By his final assignment, Ryan urges the court erred in allowing OCS to deny him custody and placement of C.N. “based on the demand for a home study under the Interstate Compact on the Placement of Children.” He contends that ICPC’s requirement of a home study is subject to various exceptions in La. Ch. C. art. 1615(1) and does not apply “in cases in which a parent is being considered for placement of his or her child within OCS custody.”
Ryan’s position lacks merit. The ICPC, which would authorize the home study, does not apply to “[t]he sending or bringing of a child into a receiving state by his *876 parent, stepparent, grandparent, adult brother or sister, adult uncle or aunt, or his guardian and leaving the child with any such relative or nonagency guardian in the receiving state.” La. Ch. C. art. 1615(1) (emphasis added). C.N. was neither sent nor brought to Iowa by Ryan, but through the intervention of OCS. This exemption simply does not apply. On the record presented, the request for a home study is no abuse of discretion. This assignment lacks merit.

Conclusion

For the reasons expressed, the judgment of case review is affirmed. Costs are to be paid by Ryan Hawkinberry.
AFFIRMED.

. One of the boys, A.B., is C.N.’s half brother; the other, J.H., is the child of James from a prior relationship.

. Three of these children are from Mrs. Hawkinberry's previous marriage; the youngest is Ryan's child.

. The reports documented Ryan's string of traffic convictions and revoked driver’s license; also, in early 2005 Ohio officials investigated Ryan and his wife for allegations of child neglect, but the cases were dismissed because Ryan and his wife refused to cooperate.