BEER, Judge.
On September 5, 1974 the Juvenile Court for the Parish of Jefferson found that Ann Marie Black was neglected and entered an order that she be placed in custody of the Department of Public Welfare. We affirm.
Certain material uncontested facts are clearly shown in the record:
1. Ann Marie was born on March 21, 1970. Her father had abandoned her mother after she became pregnant and that individual’s whereabouts continues unknown. The single part he played in this tragedy is Ann Marie’s conception. He then moves on.
2. Sylvia Black soon thereafter moved in with a man named Richmond and bore him several illegitimate children. Richmond provided a home for Sylvia and all of the children including Ann Marie.
*176 3. In the fall of 1971 (when she was about a year-and-a-half old) Ann Marie was sent to' live with Wesley and Rosa Lewis who reside in Jefferson Parish and within- the • jurisdiction of the Juvenile Court for the Parish of Jefferson.
4. This arrangement originally came about because of a family connection between Sylvia Richmond and Mr. Lewis. There is no reason to believe that this informal arrangement was not essentially in Ann Marie’s best interest at the time — all things considered.
5. The arrangement above described continued without upheaval or upset until the summer of 1974 during which time there was, apparently, a growing affection between Mr. Wesley Lewis and Ann Marie, although Mr. Lewis, a merchant mariner, was not home a great part of the time. It was clear to the trial judge (and to us) that Mr. Lewis had, and still has, a sincere and heartfelt devotion to this little girl and a continuing interest in her welfare.
6. In June of 1974 Ann Marie showed signs of having been the recipient of apparently harsh physical treatment which led to the involvement of the Parish authorities and precipitated the hearing which resulted in the judgment now before us on appeal.
Other facts — not necessarily uncontested —are also clear to us from the record:
1. Sylvia Richmond, Ann Marie’s natural mother is not much interested in her little girl. This indifference may be explained by various emotional, economic and personality conflict factors and pressures which precipitated the transfer of Ann Marie from the Richmond home to the Lewis home. It is sufficient to say that, as of this time, the only relative whose concern for Ann Marie has been reasona-ably consistent is Mr. Lewis.*
2. Mrs. Lewis, left alone for extended periods when Mr. Lewis is at sea, is not patient wtih Ann Marie. She acknowledges that she has, on fairly numerous occasions, struck Ann Marie with her hand, a switch, a hairbrush, and other objects, and has turned the garden hose on her as a disciplinary measure.
3.Although the neighbors generally support Mrs. Lewis’ contention that she is nothing more than “strict” with Ann Marie, the physical facts apparent at the time this matter was heard in the Juvenile Court challenge this contention.
Turning to the particular chronology of events that caused the State of Louisiana and the Parish of Jefferson to become intimately involved and seriously concerned with the future welfare of this little girl we go back to Friday, June 14, 1974. On that day Ann Marie was attending a day camp located in Jefferson Parish. Though the exact details are vague, the possibility exists that Ann Marie, allegedly unsupervised for a moment, ingested some amount of the contents of a box of rat poison without any noticeable results at the time. Fortunately the amount ingested (if any was, indeed, ingested at all) must have been small because no illness resulted therefrom.
On the following Monday morning Ann Marie came to day camp as usual but showed clear indication of having been physically beaten. The juvenile authorities were contacted. An investigation followed and from that it became apparent that during the weekend Ann Marie had been disciplined several times by Mrs. Lewis. The degree of imposition of corporal punishment administered to Ann Marie by Mrs. Lewis remains somewhat in doubt. Mrs. Lewis’ able counsel contends that the components of the rat poison ingested on Friday had the effect of greatly exaggerating the appearance of severity of the spankings and “switchings” that were, admittedly, administered. He is supported in this by expert testimony which confirms' that the particular brand identified by the *177 box Ann Marie was found with does contain the compound “Warfarin” which can affect the blood supply in a way that the physical result of spankings and switchings could appear more brutal than actually was the case.
On the other hand, the record discloses that Mrs. Lewis first denied that she had in any way caused ■ the injuries to Ann Marie and suggested a number of other possible sources, including, among others, a beating by one of the erratic tenants at a neighboring apartment, a fight with another child, a fall from a tree, a fall down the steps, and a previously forbidden crawling on top of nearby air conditioning units. Later, however, Mrs. Lewis admitted that corporal punishment was administered by her but contended that it was non-malicious, moderate, reasonable and necessary.
The Juvenile Court heard and observed the substantial number of witnesses called in connection with the extensive hearing of this matter and concluded that Ann Marie’s conditions was the result of “abnormal beatings” administered by Mrs. Lewis. The record supports this conclusion and we see no basis upon which it could be determined that the trier of fact breached his wide discretion in arriving at this critical finding.
The trial judge also found that Ann Marie’s natural mother, Sylvia Richmond, had been and still was, living in open concubinage with the father of the three illegitimate children she had borne since the birth of Ann Marie. He found that although it was not clear whether Sylvia Richmond had actual knowledge of the “abnormal beatings” administered by Mrs. Lewis, her general indifference toward Ann Marie was apparent. On this point the trial court’s findings are important and we quote from the judgment:
“ * * *. She gave no adequate reason for her action of surrendering the child to Mr. & Mrs. Lewis other than that Mr. & Mrs. Lewis seemed to be able to handle the child and by her actions and admissions she has had no interest in the welfare of this child until these proceedings were instituted. The Court finds, at the present time, that Ms. Richmond is an irresponsible, apathetic and unfit mother. The Court finds it inconceivable that a parent who had the best interest of her child in mind, w*6uld abandon that child at the tender age of nine months, to the care of a person who has severely beat the child. Quite to the contrary, Ms. Richmond has exhibited a total disregard and wanton neglect of the well being of her child.”
Though these findings seem harsh, there is little in the record to refute them in spite of the fact that, in fairness, it must be noted that at the time Sylvia Richmond sent Ann Marie to live with the Lewis’ she could not have reasonably anticipated the above described events. Yet, on the present showing there is ample basis for the determination that Ann Marie’s best interests will not be served by sending her to live with Sylvia Richmond.
Able counsel for appellants has raised a serious legal issue contending that the Juvenile Court has “applied a neglect statute to an abuse case.” Specifically, the assertion is made that, at any event, although the record may support the finding that Ann Marie was “abused” (though this is denied),, she was not “neglected.” Counsel contends the Juvenile Court held Ann Marie to be “neglected within the purview of LSA-R.S. 13:1569 and LSA-R.S. 13:1570.”
LSA-R.S. 13:1580 is the implementation statute which sets up the procedural guidelines for the court to follow when a child is within the purview of LSA-R.S. 13:1561 through 13:1592 or, by implication, within LSA-R.S. 14:403 which states:
“A. The purpose of this section is to protect children whose physical or mental health and welfare are adversely affected by abuse and/or neglect and may be further threatened by the conduct of those responsible for their care and pro *178 tection by providing for the mandatory reporting of suspected cases by any person having reasonable cause to believe that such case exists. It is intended that as a result of such reports the protective services of the state shall be brought to bear on the situation in an effort to prevent further abuses, and to safeguard and enhance the welfare of these children. This section shall be administered and interpreted to provide the greatest possible protection as promptly as possible for such children.
“B. For the purposes of this section, the following terms shall mean:
« * * * »
“(3) ‘Abuse’ is the infliction of physical or mental injury or the causing of the deterioration of a child and shall include exploiting or overworking a child to such an extent that his health, moral or emotional well-being is endangered.
“(4) ‘Neglect’ is the failure to provide by those legally responsible for the care and maintenance of the child, the proper or necessary support, education as required by law, or medical, surgical, or any other care necessary for his well-being.”
ft jfc sjc * tf
“G, (7) * * *. The juvenile court or other court exercising juvenile jurisdiction shall have jurisdiction to issue any order it deems necessary for the protection and welfare of the child.” (Emphasis added.)
LSA-R.S. 13:1580 provides for the adjudication of the child involved as a “neglected child” in order that the court may, in its judgment, proceed with various appropriate forms of relief.
Thus, it is quite in order for there to be a finding that the child is “abused”, either as defined by LSA-R.S. 14:403 or within the generally accepted definition of that term, and a subsequent judgment that she is “neglected”. The Juvenile Court was correct in the finding and the judgment.
Parenthetically we are obliged to observe that neglect is often the handmaiden of abuse in cases such as this. Had there been something less than complete neglect of Ann Marie by her natural mother, Sylvia Richmond, there would have been far less likelihood of abuse at the hands of Mrs. Lewis.
There is properly, a significant and well-founded presumption in our law in favor of a parent’s right to custody as against the State. But that presumption is, on a direct contrary factual showing, eroded if those facts disclose that the child’s best interest requires protection of the State of Louisiana. See: Gervais v. Falgoust, 285 So.2d 583 (La.App. 4th Cir. 1973).
Appellants also urge the premise that, at worst, the episode which precipitated the original proceedings was an isolated one and effectively demonstrate that the record is bare of any evidence showing that the abuse of Ann Marie was a usual thing. Coupled with this is the related contention that Sylvia Richmond did not have any previous knowledge that Ann Marie was— or might have been — abused, and no knowledge of this episode except after the fact.
This reasoning is specious. A one time, very minor traffic violation calls the authority’s attention to the driver of an offending vehicle. He is obviously driving while intoxicated. Must the court restrict its inquiry to the minor traffic violation?
Very often the single instance of abuse or neglect that catches the official eye and offends the official conscience is only the tip of the iceberg. Fortunately for little girls like Ann Marie, the legislature of this State has enacted legislation which empowers the Juvenile Court to institute protective action. The fact that *179 this one instance of abuse (assuming that it was the only one) puts the various applicable statutes into operation in Ann Marie’s behalf is a tribute to the simple majesty of the law. The inexorable response of the law to Ann Marie’s plight is not based upon the number of times that she has been abused, but upon the fact that she has been abused at all. The fact of that incident has provoked an inquiry which has resulted in the finding that she was not only abused but is neglected and requires protection not only from the abuse of Mrs. Lewis but from the neglect of Sylvia Richmond.
Our approval of the manner in which the Juvenile Court has handled this matter should not be construed as a criticism of Mr. Lewis. The record convinces us that Ann Marie, whose interest we are sworn to protect, has, in her own way, asked for someone to please love her. Mr. Lewis, of all those whose paths have crossed the unhappy little trail of Ann Marie, has responded best, taking all factors into consideration. Though we doubt that Mrs. Lewis completely shares his feelings, we would not wish by affirmation of the judgment to preclude forever the possibility of a return of Ann Marie to the Lewis home if the Juvenile Court should, at some later time, deem it to be in Ann Marie’s best interest. Specifically, we do not, by our affirmance, impliedly hold that Ann Marie’s best interest necessarily requires that she never again live with Mr. and Mrs. Lewis. The same, of course, is true with respect to Ann Marie’s living with her natural mother. Only time and the acknowledged wisdom of the Juvenile Judges of Jefferson Parish aided by the social workers, whose advice, insight, and prudence they rely upon, can ultimately resolve this. For the present, Ann Marie’s interest is best served by remaining under the Juvenile Court’s protection. It is our hope that, when proper checks and safeguards are implemented, administrative action by the appropriate juvenile authorities will result in Ann Marie being returned to the private sector where she can love and be loved with the unqualified abandon that should be the hallmark and inalienable right of a happy child.
For the foregoing reasons the judgment of the Juvenile Court is affirmed, each party to bear his own costs.
Affirmed.

 Mr. Lewis is the brother of Ann Marie’s maternal grandmother.